## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| State Farm Mutual Automobile Insurance Company and State Farm Fire and Casualty Company,<br><br>       Plaintiffs,<br><br>v.<br><br>Healthcare Chiropractic Clinic, Inc. and Huy Nguyen, DC,<br><br>       Defendants. | Case No. 15-cv-02527 (SRN/HB)<br><br><br>**MEMORANDUM OPINION AND ORDER** |

Julie N. Nagorski, William L. Moran, and Michael M. Carter, HKM Law Group, 30 E. 7th St., Ste. 3200, St. Paul, MN 55101, for Plaintiffs.

Emily A. Ambrose and Michael A. Hatch, Blackwell Burke PA, 431 S. 7th St., Ste. 2500, Minneapolis, MN 55415, for Defendants.

SUSAN RICHARD NELSON, United States District Judge

This matter is before the Court on Defendants Healthcare Chiropractic Clinic, Inc.'s ("HCCI") and Dr. Huy Nguyen's ("Nguyen") (collectively, "Defendants") Motion to Dismiss [Doc. No. 13]. A hearing on the motion was held August 13, 2015. For the reasons set forth below, the motion is denied.

## I.  BACKGROUND

In 1974, the State of Minnesota enacted the Minnesota No-Fault Automobile Insurance Act ("No-Fault Act") in response to the detrimental impact of automobile accidents on uncompensated injured persons. See Minn. Stat. § 65B.42 (2015). The No-

Fault Act calls for a minimum payment of $20,000 in medical expense benefits and $20,000 in income loss, replacement services loss, funeral expense loss, survivor's economic loss, and survivor's replacement services loss benefits to victims of automobile accidents, without regard to fault for the accident.  See Minn. Stat. § 65B.44, subd. 1.  Important to the present matter, only medical expenses which are reasonable and necessary are eligible for reimbursement.  Id.  Victims of motor vehicle accidents who seek medical treatment for their injuries must submit benefit applications with their primary insurance companies.  See Minn. Stat. § 65B.55, subd. 1.  Often, the treatment provider will submit these claims on behalf of the insured-patient.  Plaintiffs State Farm Mutual Automobile Insurance Company and State Farm Fire and Casualty Company (collectively, "Plaintiffs") allege Defendants engaged in a fraudulent scheme related to chiropractic care claims submitted for reimbursement pursuant to the No-Fault Act.

The parties here vehemently dispute the contents of Plaintiffs' Complaint and attached exhibits.  Thus, the Court endeavors to set out the Complaint in great detail.  As is the standard on a motion to dismiss, the facts and allegations within the Complaint are assumed to be true.  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 572 (2007).

### A. Parties

Plaintiffs are both insurance companies incorporated in and based out of Illinois.  (Compl. at ¶¶ 17-18 [Doc. No. 1].)  Both provide automobile insurance in the State of Minnesota.  (Compl. at ¶ 21.)  This insurance includes no-fault coverage pursuant to the No-Fault Act.  (Id.)

HCCI is a chiropractic clinic incorporated in and based out of Minnesota.  (Id. at ¶ 19.)  Nguyen, a chiropractor licensed in Minnesota, is the Chief Financial Officer of HCCI and owns the company.[1]  (Id. at ¶ 20.)  Chiropractors other than Nguyen have or do work for HCCI.[2]  (See id. at ¶¶ 30-33 (referring to "other chiropractors"); see generally Ex. F to Compl. [Doc. No. 1-6] ("Ex. F") (citing statements by patients of HCCI that they were treated by chiropractors other than Nguyen).)  Defendants "purport to evaluate and treat individuals who have been in motor vehicle accidents and complain of neck and back pain, among other things."  (Compl. at ¶ 24.)  Defendants treated numerous patients insured by Plaintiffs and submitted claims to Plaintiffs for reimbursement under the insured-patients' no-fault coverage ("Claims").  (See id. ¶¶ 1–3.)

**B.  The Alleged Fraudulent Scheme**

Plaintiffs allege that since at least 2006 and running up to the present day, (id. at ¶ 12), Defendants engaged in a multi-faceted fraud ("the Fraudulent Scheme") related to the Claims, (see id. at ¶ 2).  The Fraudulent Scheme purportedly consists of three inter-

---

[1] Pursuant to Minnesota law, "a corporate officer is not liable for the torts of the corporation's employees unless he participated in, directed, or was negligent in failing to learn of and prevent the tort."  Morgan v. Eaton's Dude Ranch, 239 N.W.2d 761, 762 (Minn. 1976).  At the hearing, Defendants' counsel confirmed Nguyen is the owner of HCCI.  There is no evidence in the record to suggest HCCI has any other owners.  Since Plaintiffs allege that Nguyen directly participated in the fraudulent scheme (see, e.g., Compl. at ¶¶ 1–3, 5, 9, 30, 33–34, 37, 44, 46, 49, 50–51, 56) the Court need not dismiss Plaintiffs' claims against Nguyen on any limited liability basis.

[2] The Complaint contains no evidence of the names of these other chiropractors, when they worked for HCCI, or in what capacity they worked for HCCI (e.g., employees, independent contractors, consultants, etc.).

related parts.   First, Plaintiffs contend Defendants employ predetermined (or "cookie-cutter") diagnosis and re-examination protocols which lead to medically unnecessary treatments Defendants intentionally misrepresented to Plaintiffs were necessary when seeking reimbursement.   (See id. at ¶¶ 2, 4–5, 8–9, 30–37, 40, 45, 47, 53–56.)   Second, Defendants allegedly billed for services not performed at all or not performed as billed to Plaintiffs.[3]   (See id. at ¶¶ 3, 6, 9, 30, 40–41, 46, 48.)   Third, Plaintiffs accuse Defendants of fraudulently modifying patient records and other documentation to support the fraudulent billings sent to Plaintiff.[4]   (See id. at ¶¶ 49–50.)   According to Plaintiffs, Defendants intended to maximize the Claims they submitted to Plaintiffs under the No-Fault Act, not diagnosis and appropriately treat the actual medical conditions of the insured-patients.   (See id. at ¶¶ 4–5, 31–32, 40, 52–53.)

To support their allegations about the Fraudulent Scheme, Plaintiffs offer two sources of evidence.   The first are statements from two former HCCI employees, an unnamed chiropractic assistant and a massage therapist.[5]   (See id. at ¶¶ 43–52.)   Both

---

[3] This practice is sometimes called "upcoding" in reference to the billing codes used by healthcare providers to identify the services they render to insured-patients.

[4] Plaintiffs also allege Defendants' employees, with Defendants' knowledge and encouragement, solicited potential patients. (Compl. at ¶¶ 44, 51.)   Minnesota Statute § 65B.54, subd. 6 prohibits solicitation, but does not provide a private cause of action. Allstate Ins. Co. v. Linea Latina De Accidentes, Inc., 781 F. Supp. 2d 837, 849 (D. Minn. 2011).   However, at the hearing, Plaintiffs' counsel clarified they were not pursuing solicitation as an independent claim, but rather offered the solicitation as evidence to "bolster" their fraud claim.

[5] There is no evidence in the Complaint as to when these unnamed former employees worked at HCCI.

allegedly had knowledge of HCCI's records and record producing processes.  (Id. at ¶ 48, 50.)  The chiropractic assistant alleges that Defendants employed a predetermined treatment protocol, conducted limited initial examinations, performed limited adjustments and modalities, and provided treatments unrelated to patients' complaints or areas of pain.  (Id. at ¶¶ 45-46.)   The massage therapist alleges that Defendants employed a "frequency protocol" where by patients were seen three times a week regardless of their medical needs. (See id. at ¶ 47.)  Both former employees allege that some patients would come to HCCI, sign treatment records, but then leave without receiving any treatment.  (Id. at ¶ 48.)  They further allege that Defendants would then fraudulently complete the records to show treatments not actually rendered.   (Id.)   Both former employees claim that Nguyen instructed them to change patient records, or filled in those records without even consulting the patient, in order to exaggerate the patients' conditions to support additional, unnecessary treatments.  (Id. at ¶¶ 49–50.)  The chiropractic assistant also alleges that information about patients' symptoms and conditions were simply transferred from chart to chart, not actually reflecting the condition of a particular patient.  (Id. at ¶ 49.)   Finally, the chiropractic assistant asserts that patient records were left blank, only to be completed later by chiropractors who were not actually involved in the patient's treatment.  (Id.)  However, none of the allegations by these former employees are tied to a specific insured-patient or particular Claim submitted to Plaintiffs.

Second, Plaintiffs attached seven exhibits to the Complaint.  (See Doc. Nos. 1-1 – 1-7].)   One is an example of the CMS 1500 Uniform Billing Form ("the 1500 Form")

Defendants were required by law to use, see Minn. Stat. § 65J.52, when billing services rendered to Plaintiffs. (See Ex. G to the Compl. ("Ex. G") [Doc. No. 1-7]; Compl. at ¶¶ 54–56.) No 1500 Forms signed by Defendants were presented. However, Plaintiffs allege Defendants did submit numerous 1500 Forms, along with other patient records and documentation, to them over the course of several years. (See Compl. at ¶¶ 53–56.) The 1500 Form requires the healthcare provider to attest that the services provided were medically appropriate and necessary for the patient and furnished by the provider or another qualified individual under the provider's direction.[6] (See Ex. G; Compl. at ¶ 54.)

The other six exhibits consist of spreadsheets Plaintiffs allege evidence Defendants' Fraudulent Scheme. The first is a spreadsheet containing 185 Claims submitted to Plaintiffs by Defendants. (See Ex. A to the Compl. ("Ex. A") [Doc. No. 1-1].) Plaintiffs contend all 185 Claims were fraudulent as a result of the Fraudulent Scheme. (See Compl. at ¶¶ 11, 59.) The spreadsheet identifies the 185 Claims by the last four digits of the Claim number and for each provides the date of loss, lists the date of first and last payment by Plaintiffs, and the total amount paid. (See Ex. A) Some Claims may not have been "straight-paid" by Plaintiffs to Defendants, but instead were paid through some other process (e.g., arbitration).

---

[6] Defendants make passing assertions, without any analysis or legal support, that the 1500 Form's requirements and attestations apply only to payments sought from Medicaid or Medicare. (Memorandum in Support of Defendants' Motion to Dismiss ("Defs' Memo.") at 7 [Doc. No. 15]; Reply in Support of Defendants' Motion to Dismiss ("Defs' Reply") at 8 [Doc. No. 20].) Plaintiffs vigorously dispute this narrow reading. (See Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss ("Pl.'s Resp.") at 15–16 [Doc. No. 18].) The plain language of the 1500 Form suggests it applies more broadly than Defendants claim. (See Ex. G.) Given Defendants' lack of supporting analysis and the fact that this matter is before the Court on a motion to dismiss, the Court assumes the facts alleged by Plaintiffs are true.

6

(See, e.g., Ex. A at 7 (column labelled "Attorney/Insured Payment").)  Plaintiffs assert Ex. A represents their losses (approximately $1.3 million) as a result of the Fraudulent Scheme. (Compl. at ¶¶ 11, 92, 98.)  These losses are not apportioned amongst the Plaintiffs.

Next, Plaintiffs present several spreadsheets purporting to show Defendants' predetermined diagnosis, treatment, and re-evaluation protocols.  (See Exs. B–E to the Compl. [Doc. Nos. 1-2 – 1-5].)  Exhibit B contains 303 examples[7] of diagnoses Plaintiffs contend Defendants made pursuant to their "cookie-cutter" diagnosis protocol.  (See Ex. B [Doc. No. 1-2]; Compl. at ¶ 31.)  The exhibit identifies the Claims by the last four digits of their claim number, provides the date of loss, the initial date of service billed, and the codes used by Defendants to identify the diagnosis for each insured-patient.  (See Ex. B at 1–8.)  It also provides a table showing the number of times a particular diagnostic code was used, and in what percentage of the Claims each code appears.  (Id. at 11–12.)

Exhibit C shows the "stock, repeated cookie-cutter treatment recommendations" assigned to each insured-patient.  (Compl. at ¶ 32; Ex. C to Compl. [Doc. No. 1-3].)  Again, the exhibit contains the last four digits of each Claim number, date of loss, initial date of service billed, and the codes used by Defendants to describe the treatment they allegedly performed.  (See Ex. C at 1–12.)  Plaintiffs argue that Defendants, if they provided these treatments at all, did not provide them because they were medically necessary.  (Compl. at ¶

---

[7] Confusingly, Ex. B contains 303 examples whereas Ex. A contains only 185 total Claims.  Exhibit C similarly carries 303 examples.  Exhibit D contains only 31, while Ex. E contains 71.  No explanation is offered for these discrepancies.  However, important for this opinion is that many of the 185 Claims, as identified by the last four digits of the claim numbers in Ex. A, also appear in Exs. B, C, D, and E.

40.)  Instead, each treatment was given to maximize the charges Defendants submitted to

Plaintiffs for no-fault or other insurance coverage reimbursement.  (Id.)  Plaintiffs contend

that "[w]hile any one of the treatment modalities may be medically necessary for a

particular patient on a given day, the comprehensive combination of treatments allegedly

provided is seldom, if ever, medically necessary for any patient on a single day, much less

during virtually every visit."  (Id.)

The next spreadsheet purports to offer further evidence of the "cookie-cutter"

treatment prescribed to each insured-patient.  (Compl. at ¶ 35; Ex. D to the Compl. [Doc.

No. 1-4].)  Exhibit D shows similar treatment plans for 31 Claims along with the date of

first treatment at HCCI and the last four digits of the Claim number.  Exhibit E evidences

"record entries that show virtually every re-examination performed" resulted in nearly

identical continuing treatment plans.  (Compl. at ¶ 37; Ex. E to Compl. [Doc. No. 1-5].)

The exhibit identifies 71 Claims, the date of the re-examination and the resulting treatment

plan.  (See Ex. E at 1–2.)

Finally, Plaintiffs offer summaries of sworn statements they obtained from various

insured-patients through examinations under oath.  (Compl. ¶ 42; Ex. F to Compl. [Doc. No.

1-6].)  Exhibit F lists twenty summaries[8] of these examinations and gives the Claim number,

the insured-patient's initials, the date of loss, and the date the insured-patient's testimony

---

[8] Using the Claim number, the Court can only trace seven of the twenty summaries
provided in Ex. F to Claims which appear in Ex. A: Claims 23-1993-420, 23-2186-732,
23-2367-147,  23-089L-826,  23-05R3-232,  23-16C1-569,  23-17W7-808.    Plaintiffs
provide no explanation why the other Claims summarized in Ex. F do not appear in Ex.
A.  However, for the purposes of this opinion, the seven Claims that do track between Ex.
A and Ex. F are sufficient, as described below.  The Court focuses on these seven Claims.

was taken.  (See Ex. F at 1–8.)  These summaries allege that the insured-patients reported not receiving treatments and examinations Defendants billed to Plaintiffs, (see, e.g., id. at 1 (Claim 23-1993-420), at 4 (Claim 23-2367-147), at 5 (Claim 23-089L-826), at 6 (Claim 23-05R3-232), at 8 (Claim 23-16C1-569)), receiving treatments and examinations different than those billed to Plaintiffs, (see, e.g., id. at 2 (Claim 23-2186-732), at 6 (Claim 23-05R3-232), at 8 (Claim 23-16C1-569 and Claim 23-17W7-808)), or being treated by chiropractors other than Nguyen, despite Nguyen being listed as the treating practitioner on the bills submitted to Plaintiffs, (see, e.g., id. at 4 (Claim 23-2367-147), at 5 (Claim 23-089L-826)).  One insured-patient also purportedly confirmed receiving treatment not related to the injuries he/she suffered (see id. at 5 (Claim 23-089L-826)), while another purportedly confirmed Defendants' use of a predetermined treatment protocol, (see id. at 4 (Claim 23-2367-147)).

### C.  Plaintiffs' Claims and Procedure Posture

Based on the above allegations and facts, Plaintiffs brought claims for declaratory relief, (Compl. at ¶¶ 60–71), common law fraud and misrepresentation (id. at ¶¶ 72–92), and unjust enrichment, (id. at ¶¶ 93–98), against Defendants.  Plaintiffs allege damages of approximately $1.3 million, representing the total amount paid on the Claims listed in Ex. A.  (See Compl. at ¶¶ 92, 98.)

Defendants filed a Motion to Dismiss on June 25, 2015 [Doc. No. 13] along with a Memorandum in Support of that Motion ("Defs' Memo.") [Doc. No. 15].  Plaintiffs filed a Memorandum in Opposition to Defendants' Motion on July 16, 2015 ("Pl.'s Resp.") [Doc.

No. 18].  Defendants filed a reply brief on July 29, 2015 ("Defs' Reply") [Doc. No. 20] and

a hearing was held on the Motion to Dismiss on August 13, 2015.

## II.  DISCUSSION

### A.  Standard of Review

Defendants move to dismiss Plaintiffs' Complaint pursuant to Federal Rule of Civil

Procedure 12(b)(6) for failure "to plead their fraud-based claims with particularity" as

required by Federal Rule of Civil Procedure 9(b).  (Defs' Mot. to Dismiss.)

When evaluating a motion to dismiss under Rule 12(b)(6), the Court assumes the

facts in the complaint to be true and construes all reasonable inferences from those facts

in the light most favorable to plaintiffs.  Morton v. Becker, 793 F.2d 185, 187 (8th Cir.

1986).  However, the Court need not accept as true wholly conclusory allegations, Hanten

v. Sch. Dist. of Riverview Gardens, 183 F.3d 799, 805 (8th Cir. 1999), or legal

conclusions plaintiffs draw from the facts pled, Westcott v. City of Omaha, 901 F.2d

1486, 1488 (8th Cir. 1990).  In addition, the Court ordinarily does not consider matters

outside the pleadings on a motion to dismiss.  See Fed. R. Civ. P. 12(d).  The Court may,

however, consider exhibits attached to the complaint and documents that are necessarily

embraced by the pleadings, Mattes v. ABC Plastics, Inc., 323 F.3d 695, 697 n.4 (8th Cir.

2003), and may also consider public records, Levy v. Ohl, 477 F.3d 988, 991 (8th Cir.

2007).

To survive a motion to dismiss, a complaint must contain "enough facts to state a

claim to relief that is plausible on its face."  Twombly, 550 U.S. at 570 (2007).  However,

a motion to dismiss "tests the sufficiency of allegations, not the sufficiency of evidence . . . ." Morrison v. MoneyGram Int'l, Inc., 607 F. Supp. 2d 1033, 1055 (D. Minn. 2009).  A complaint need not contain "detailed factual allegations," but must contain facts with enough specificity "to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555.  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," will not pass muster under Twombly.  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Twombly, 550 U.S. at 555).  In sum, this standard "calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [the claim]." Twombly, 550 U.S. at 556.

### 1.  Pleading Under Rule 9(b)

When a plaintiff alleges fraud, it "must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b).  Intent and knowledge may be alleged generally.  Id.  The purpose behind Rule 9(b) is to allow the defendant(s) to respond and prepare a defense to the fraud allegations.  Kranz v. Koenig, 484 F. Supp. 2d 997, 1002 (D. Minn. 2007).  "The special nature of fraud does not necessitate anything other than notice of the claim; it simply necessitates a higher degree of notice." Id. (citing Abels v. Farmers Commodities Corp., 259 F.3d 910, 920 (8th Cir. 2001)).

### 2.  Common Law Fraud in Minnesota

In Minnesota, the elements of fraud are:

(1) a false representation of a past or present material fact which was susceptible of knowledge, (2) the defendant knew the representation was false or made it without knowing whether it was true or false, (3) an intention to induce plaintiff to act in reliance on the misrepresentation, (4)

the representation caused the plaintiff to act in reliance thereon, and (5) and the plaintiff suffered pecuniary damage as a result of the reliance.

Teng Moua v. Jani-King of Minnesota, Inc., 810 F. Supp. 2d 882, 890 (D. Minn. 2011)

(citing Hoyt Props., Inc. v. Prod. Res. Group, L.L.C., 736 N.W.2d 313, 318 (Minn.

2007)).

### B.  Adequacy of Pleading a Scheme to Defraud

Defendants argue that "the key problem with Plaintiffs [sic] lawsuit is that they do not identify any particular instances of alleged fraud involving any particular claims" as required by Rule 9(b).  (Defs' Memo. at 1.)  Plaintiffs counter that "the Complaint set forth overwhelming indicia of fraud so as to obviate the necessity of representative examples of fraud."  (Pl.'s Resp. at 11–12.)  Defendants insist that because Plaintiffs allege that every Claim in Ex. A was fraudulent, they were required to provide particular representative examples of fraudulent Claims, which they did not.[9]  (Defs' Reply at 2–4.)

The degree of particularity required by Rule 9(b) depends on the nature of the case

---

[9] The Court notes that Defendants' primary concern appears to be with Plaintiffs' failure to provide representative examples of Claims for treatments which were medically unnecessary.  (See Defs' Memo. at 2, 4, 7–8; Defs' Reply at 1, 6–7.)  Specifically, Defendants contend that Plaintiffs never give an example of why the treatment rendered in a particular Claim was medically unnecessary.  (See Defs' Memo. at 2, 4, 7–8; Defs' Reply at 1, 6–7.)  Defendants' alleged submission of Claims for medically unnecessary treatments was only one part of the Fraudulent Scheme.  See supra Part I.B.  Plaintiffs also allege that Defendants engaged in the Fraudulent Scheme by submitting Claims for services not actually rendered, or rendered in ways different than those billed, and fraudulently altering patient records.  See id.  The Court finds that there are sufficient particularized factual allegations in Plaintiffs' pleadings, including specific representative examples, of these portions of the alleged Fraudulent Scheme.  (See Compl. at ¶¶ 3, 6, 9, 30, 40–41, 46, 48–50; Ex. F.) Thus, the Court focuses on whether Plaintiffs pled with the necessary particularity as to the portion of the Fraudulent Scheme involving Claims for medically unnecessary treatment.

12

and the relationship between the parties.  BJC Health Sys. v. Columbia Cas. Co., 478 F.3d 908, 917 (8th Cir. 2007).  In prior cases involving disputes between insurers and healthcare providers, this Court has held that the complaint must provide details about the fraud such as the time, place and content of the misrepresentations, and information about the defendants' fraudulent acts, such as when they happened, who perpetrated them and what was gained as a result.  Liberty Mut. Fire Ins. Co. v. Acute Care Chiropractic Clinic P.A., 88 F. Supp. 3d 985, 997 (D. Minn. 2015) (citing United States ex rel. Thayer v. Planned Parenthood of the Heartland, 765 F.3d 914, 917 (8th Cir. 2014)).  "In other words, the complaint must identify the who, what, where, when, and how of the alleged fraud."  Thayer, 765 F.3d at 917 (quotations omitted).

"Where a plaintiff alleges a systematic practice of the submission of fraudulent claims over an extended period of time, the plaintiff **need not allege the specific details of every fraudulent claim.**"  Allstate Ins. Co. v. Linea Latina De Accidentes, Inc., 781 F. Supp. 2d 837, 846 (D. Minn. 2011) (citing United States ex rel. Joshi v. St. Luke's Hosp., Inc., 441 F.3d 552, 557 (8th Cir. 2006)) (emphasis added).  If sufficient indicia of reliability as to the plaintiff's fraud allegations are present, Rule 9(b)'s particularity requirement is met.  Acute Care Chiropractic, 88 F. Supp. 3d at 1002.  Indicia of reliability include "the identities of the entities and individuals involved; statements from confidential informants; deposition testimony from prior litigation; and the methods used to commit the alleged fraud."  Id.  Personal knowledge of the fraud is also an indicia of

reliability that satisfies Rule 9(b).[10]   Thayer, 765 F.3d at 918.   Only if these indicia are missing are representative examples of the fraudulent claims required.   Acute Care Chiropractic, 88 F. Supp. 3d at 1002 (citing Thayer, 765 F.3d at 917 and Joshi, 441 F.3d at 557).

Here, Plaintiffs provided sufficient detail about the who, what, when, where, and how of the Fraudulent Scheme to put Defendants on sufficient notice of their claims. They do so through the statements of former HCCI employees with personal knowledge of the scheme, spreadsheets showing the commonalities between specific Claims, and the statements of insured-patients compared against the bills submitted by Defendants.

Plaintiffs clearly describe the Fraudulent Scheme (the "what"), consisting of its three inter-related parts.   See supra Part I.B.   According to Plaintiffs, each patient who presents to a chiropractor must receive a thorough examination, treatment tailored to that particular patient's symptoms, and periodic re-examinations to ensure further treatment is necessary.   (Compl. at ¶¶ 7–8, 25–28.)   However, pursuant to the Fraudulent Scheme, this is not the procedure Defendants employed.   Instead, they allegedly submitted fraudulent Claims that were the result of predetermined diagnoses which did not address insured-patients' individual symptoms (Compl. at ¶¶ 2, 4, 6–10, 25, 30–31; Ex. B), "cookie-

---

[10] Defendants, citing Thayer, claim that personal knowledge of the submission of false claims is the "only exception" to the requirement that Plaintiffs must plead representative examples of fraudulent claims.   (Defs' Memo. at 6.)   This is not Thayer's holding.   After noting that personal knowledge of fraudulently submitted claims was an indicia of reliability, the Court went on to state that a plaintiff could satisfy Rule 9(b) by pleading "the particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted."   Thayer, 765 F.3d at 918 (quotations omitted).

cutter" treatments that were not medically necessary (Compl. at ¶¶ 1–2, 6–10, 25–26, 38, 40, 46, 52; Exs. C, D), and predetermined re-examination protocols resulting in continued medically unnecessary treatments, (Compl. at ¶ 37; Ex. E). In support, Plaintiffs provide the "universe" of fraudulent Claims the scheme allegedly generated, (Ex. A), statements by former employees with personal knowledge of the existence and operation of the scheme, (Compl. at ¶¶ 43-51), and a series of spreadsheets purporting to evidence the scheme by the common results it produced, (Exs. B–E).

Plaintiffs accuse both HCCI and Nguyen (the "who") of designing and implementing the Fraudulent Scheme, (Compl. at ¶¶ 5, 8, 24, 30, 36–38, 46, 49–50; Ex. F), and submitting fraudulent claims to Plaintiffs as a result, (id. at ¶¶ 33–34, 53).  The Fraudulent Scheme allegedly ran from at least 2006 to the present (the "when"), (id. at ¶ 12), and involved Claims for which the Plaintiffs provide the first and last dates of payment and date of loss, (Ex. A).  By deliberately submitting claims using the 1500 Form, (Ex. G), for medically unnecessary treatments, Defendants allegedly committed fraud (the "how").[11]  (Compl. at ¶¶ 11, 53–56; Ex. A.)

This level of detailed pleading closely resembles that in Acute Care Chiropractic. There, this Court found that the plaintiff-insurers provided sufficient indicia of reliability in support of their fraud allegations when they identified the individuals and entities involved, provided statements from confidential informants about the fraud, and explained the methods used to commit the fraud.  Acute Care Chiropractic, 88 F. Supp.

---

[11] Neither party disputes the "where" aspect of the alleged Fraudulent Scheme.

3d at 1002.  Thus, the fraud was alleged with more particularity than in <u>Thayer</u> or <u>Joshi</u>.[12]

<u>Id.</u>  As described above, Plaintiffs pled the who, what, when, where, and how of the

Fraudulent Scheme with nearly identical specificity and using similar evidence.

Despite the specificity in Plaintiffs' Complaint, Defendants highlight Plaintiffs'

alleged failure to present any particular examples of an instance where the treatment

received by an insured-patient was medically unnecessary.  (Defs' Memo. at 7; Defs' Reply

at 6.)  Defendants claim <u>Illinois Farmers Ins. Co. v. Mobile Diagnostic Imaging, Inc.</u>, No.

13-cv-2820 (PJS/TNL), 2014 WL 4104789 (D. Minn. Aug. 19, 2014) supports their

contention that this failure requires dismissal.  (Defs' Memo. at 8.)  However, Defendants

are mistaken.

First, particular examples of fraudulent claims are required only when the plaintiff

fails to provide the necessary indicia of reliability regarding the fraud claim.  <u>See Acute</u>

<u>Care Chiropractic</u>, 88 F. Supp. 3d at 1002.  Plaintiffs pled with particularity as to the

---

[12] The fraud in <u>Acute Care Chiropractic</u> related to the ownership of the defendant chiropractor clinics by someone other than a licensed medical professional in violation of Minnesota law.  88 F. Supp. 3d at 998-99.  However, the plaintiffs made passing mention of fraud related to claims for medically unnecessary treatment, but did not identify any specific claims or clinics related to this part of the fraud.  <u>Id.</u> at 995 n.4, 998 n.6.  Because the plaintiffs' fraud claim clearly centered on the ownership of the defendant clinics, and given the limited allegations related to medically unnecessary treatment, the Court focused its analysis on the ownership issue.  <u>Id.</u>  Here, medically unnecessary treatment is a central part of Plaintiffs' fraud allegation.  However, as described above, Plaintiffs also provided significantly more indicia of reliability on this subject than that in <u>Acute Care Chiropractic</u>.

who, what, when, where, and how of the Fraudulent Scheme and thus are not required to provide particular examples.[13]

Second, the present matter is distinguishable from <u>Mobile Diagnostic Imaging</u>. There, the plaintiff-insurers sued several dozen chiropractors, chiropractic clinics and a provider of magnetic resonance imaging ("MRI") scans ("the defendants"). <u>Mobile Diagnostic Imaging</u>, 2014 WL 4104789 at *1. Plaintiff-insurers alleged the defendants engaged in a fraudulent scheme involving kickbacks for MRI scans submitted to plaintiff-insurers for reimbursement under the No-Fault Act. <u>Id.</u> According to the plaintiff-insurers, the kickback scheme incentivized the chiropractor defendants to refer patients for medically unnecessary MRIs. <u>Id.</u> at *3. The defendants moved for dismissal pursuant to Rules 12(b)(6) and 9(b). <u>Id.</u>

Examining the plaintiff-insurers' claims regarding medical necessity, the Court found several problems. <u>See id.</u> at *12–13. Most notably, it took issue with the plaintiff-insurers for simply listing every MRI scan performed by the MRI provider during a five-year period, but arguing some unknown number of those scans were medically unnecessary because the kickback scheme incentivized the chiropractors to over-prescribe MRIs. <u>See id.</u> at * 12. The Court found this fell short of Rule 9(b)'s particularity standard. <u>Id.</u>

---

[13] Despite Defendants' assertion otherwise, Plaintiffs **do** present at least one particular example of allegedly unnecessary medical treatment. According to Plaintiffs, for chiropractic care to be medically necessary, it must be tailored to address the individual patient's symptoms. (<u>See</u> Compl. at ¶¶ 7–8, 25–28.) Allegedly, one insured-patient told Plaintiffs that he sought treatment from Defendants for neck and low back pain as the result of a car accident, but Defendants billed Plaintiffs for treatments inconsistent with these injuries. (Ex. F at 5 (Claim 23-089L-826).)

Moreover, the plaintiff-insurers provided only two representative examples of allegedly fraudulent scans.  Id.  They argued the timing of these scans, one coming at the beginning of a patient's treatment and the other at the end of another patient's treatment, indicated they were medically unnecessary.  Id. at *12–13.  The Court found this did not constitute "facts that, if proved, would show that the scans were not medically necessary." Id. at *12.

Here, Plaintiffs provide considerably more detail about the allegedly fraudulent Claims, and why they believe them to be fraudulent, than the plaintiffs in Mobile Diagnostic Imaging.   Exhibit A lists 185 Claims, all of which Plaintiffs contend are fraudulent. Plaintiffs also give details about the alleged Fraudulent Scheme, see supra Part I.B., and allege facts about "proper" chiropractic diagnosis and treatment protocols that, if proven true, would show that the Claims were medically unnecessary, (Compl. at ¶¶ 7–8, 25–28). Furthermore, Plaintiffs provide general support for their allegation in the spreadsheets showing commonalities between many Claims, (Exs. B–E), and at least one particular example of allegedly unnecessary treatment, (Ex. F at 5).   Thus, the allegations and support presented here are similar to those in Acute Care Chiropractic, 88 F. Supp. 3d at 1002 (denying the motion to dismiss) and Linea Latina, 781 F. Supp. 2d at 846 (denying a motion to dismiss because "Plaintiffs identified each claim that is allegedly fraudulent, the claim number, and the date of the claim, and they have adequately alleged examples of fraudulent claims").

Defendants undoubtedly disagree with Plaintiffs' conclusions about what constitutes necessary treatment and challenge Plaintiffs' assertions about the significance of the commonalities in the treatment provided in the Claims.  However, these issues should be resolved during the course of litigation, possibly with the assistance of expert testimony. They are not an appropriate basis for granting a motion to dismiss under Rule 12(b)(6).  See Morrison, 607 F. Supp. 2d at 1055 (motions to dismiss test the sufficiency of allegations, not evidence).  Plaintiffs' Complaint satisfies Rule 9(b).

## C. Defendants' Other Sufficiency Related Arguments

Defendants further argue that Plaintiffs' failure to plead with particularity makes it "impossible" for Defendants to determine if Plaintiffs "have valid claims" or if the Court has jurisdiction.  (Defs' Memo. at 11.)  Specifically, Defendants challenge at least some of the Claims on the basis that they were previously arbitrated (id. at 12) and that others are barred by the statute of limitations, (id. at 13).  Lastly, Defendants contend that because Plaintiffs impermissibly "lump" the State Farm Plaintiffs together, they have not shown the amount in controversy requirement for diversity jurisdiction is met.[14]  (Id. at 14.)  However, Defendants later clarified that these arguments were meant merely to "illustrate" the problems arising from Plaintiffs' failure to plead with the required particularity.  (Defs' Reply at 9.)

Defendants' "illustrations" represent additional challenges to the sufficiency of the evidence Plaintiffs present in support of their allegations.  However, a motion to dismiss

---

[14] Notably, however, Defendants did not challenge the Court's jurisdiction under Rule 12(b)(1) in their Motion to Dismiss.  (See Mot. to Dismiss; Defs' Reply at 9.)

is not the proper vehicle to challenge the sufficiency of evidence. See Morrison, 607 F. Supp. 2d at 1055; see also Network F.O.B., Inc. v. P & J Exp., LLC, No. 13-cv-3656 (PJS/LIB), 2014 WL 1028429, at *1 (D. Minn. Mar. 17, 2014) (whether evidence is sufficient to establish plaintiff's claims is "beside the point" when considering a motion to dismiss). As described above, Plaintiffs have pled with the particularity required by Rules 9(b) and 12(b)(6).

Whether or not some of the Claims may be precluded by prior arbitration or may not fall within an applicable statute of limitations, these are issues to resolve with the benefit of discovery and a full record.[15] Furthermore, the subject matter jurisdiction of this Court may be challenged at any time. Grupo Dataflux v. Atlas Global Grp., L.P., 541 U.S. 567, 571 (2004). If later, upon a more developed record, there appears to be an issue related to the amount in controversy, the Court's jurisdiction may be re-examined. Defendants will have ample opportunity to attack the sufficiency of Plaintiffs' evidence, but their sufficiency arguments cannot serve as the basis for dismissal now.

### D. Plaintiffs' Claim for Declaratory Relief

Plaintiffs bring a claim for declaratory relief under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201. (Compl. at ¶ 61.) Specifically, Plaintiffs asked for a declaration that the Claims submitted by Defendants are fraudulent, that Plaintiffs are

---

[15] For the purposes of resolving Defendants' Motion to Dismiss, it suffices to note that many of the Claims in Ex. A are within the six year statute of limitations for fraud set by Minn. Stat. § 541.05, subd. 1(6) regardless of any issues related to when Defendants' allegedly fraudulent behavior could have been discovered. Similarly, many of the Claims appear to have been "straight-paid" to Defendants and not subject to any arbitration.

entitled to recover the benefits already paid to Defendants, and excusing Plaintiffs from paying pending or future bills submitted by Defendants.  (Id. at ¶ 71.)  Defendants argue that because Plaintiffs are obligated to pay for any Claims which are not fraudulent, and it is unclear which Claims are fraudulent, the declaratory relief claims should be dismissed. (Defs' Memo. at 14-15.)  Defendants further contend that the declaratory relief claim is duplicative of Plaintiff's fraud and unjust enrichment claims and thus the Court should exercise its discretion in dismissing the duplicative claim.  (Id. at 15.)  Finally, Defendants assert that because Plaintiffs' declaratory relief seeks to excuse Plaintiffs from paying future claims submitted by Defendants, any opinion issuing that relief would be an advisory opinion.  (Id.)

The Declaratory Judgment Act allows a court to "declare the rights and other legal relations of any interested party seeking such declaration, **whether or not further relief is or could be sought.**"  28 U.S.C. § 2201(a) (emphasis added).  Even if a declaratory judgment claim is duplicative of a party's other claims, this does not make it "unviable." See R.S. ex rel. S.S. v. Minnewaska Area Sch. Dist. No. 2149, 894 F. Supp. 2d 1128, 1148 (D. Minn. 2012).  "It would be premature to dismiss an otherwise viable claim at the motion to dismiss stage simply because it appears to be duplicative."  Id. (refusing to dismiss plaintiffs' declaratory judgment claim and noting the opportunity to visit the viability of that claim on summary judgment).

---

Plaintiffs' declaratory relief claim is sufficiently pled to withstand a motion to dismiss.  The viability of that claim, including its request for relief from paying future bills submitted by Defendants, is more properly assessed at a later time.

**THEREFORE, IT IS HEREBY ORDERED THAT:**

1.      Defendants' Motion to Dismiss [Doc. No. 13] is **DENIED**.


Dated:  October 23, 2015                    s/Susan Richard Nelson
                                            SUSAN RICHARD NELSON
                                            United States District Judge